AO 91 (Rev. 11/11) Criminal Complaint                                    AUSA Jimmy L. Arce (312) 353-8449





UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ARSHAD ZAYED

CASE NUMBER: 22 CR 366

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between in or around August 2021 and in or around June 2022, at Matteson, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 922(a)(1)(A) | willfully engaged in the business of manufacturing and dealing in firearms without a license. |
| Title 18, United States Code, Section 922(o) | unlawfully possessed and transferred a machine gun. |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

s/Shamar Bailey (with permission BWJ)

SHAMAR BAILEY
Special Agent, Federal Bureau of
Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: July 26, 2022

_Judge's signature_

City and state: Chicago, Illinois

BETH W. JANTZ, U.S. Magistrate Judge
_Printed name and title_

UNITED STATES DISTRICT COURT     )
                                             )

NORTHERN DISTRICT OF ILLINOIS     )

## **AFFIDAVIT**

I, Shamar Bailey, being duly sworn, state as follows:

1. I am a Special Agent with the United States Department of Justice, Federal Bureau of Investigation ("FBI"), and have been so employed since approximately March 2016. My current responsibilities include the investigation of violent crimes, criminal enterprises, violations relating to the illegal sale and transfer of narcotics and firearms, and violent criminal acts in furtherance of criminal enterprises.

2. This affidavit is made in support of:

    a. a criminal complaint alleging that ARSHAD ZAYED has committed the offense of willfully engaging in the business of manufacturing and dealing in firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A); and unlawful possession and transfer of a machine gun, in violation of Title 18, United States Code, Section 922(o) (the "Subject Offenses");

    b. an application for a warrant to search the premises located at 3616 Union Avenue in Steger, Illinois, which is a premises used by ARSHAD ZAYED to manufacture and store firearms that he unlawfully distributes to others (as explained below), described further in Attachment A-1 ("**Subject Premises**"), for evidence, instrumentalities, fruits, and contraband, described further in Attachment B-1, concerning the Subject Offenses;

    c. an application for a warrant to search the Apple iPhone cellular telephone used by ARCHIE ZAYED, with phone number (815) 280-3200 and bearing IMSI 310260759711362, with service provided by T-Mobile, Inc., as described further in Attachment A-2 ("**Subject Phone 1**"), for evidence, instrumentalities, and

fruits described further in Attachment B-2, concerning the Subject Offenses; and

d.   an application for a warrant to search the Apple iPhone cellular telephone used by ARCHIE ZAYED, with phone number (872) 251-2555 and bearing IMSI 310260579554837, with service provided by T-Mobile, Inc., as described further in Attachment A-3 ("**Subject Phone 2**"), for evidence, instrumentalities, and fruits described further in Attachment B-3, concerning the Subject Offenses.

3.   The statements in this affidavit are based on multiple sources, including but not limited to: my personal knowledge; my review of reports and documents related to this investigation; my review of video recordings related to this investigation; conversations with others who have knowledge of the events and circumstances described in this affidavit; my review of law enforcement databases; my training and experience and the training and experience of other agents with whom I work; and information provided to me by persons with knowledge regarding relevant facts.

4.   Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint and securing warrants to search the **Subject Premises**, **Subject Phone 1**, and **Subject Phone 2**. I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe establish probable cause to believe that ARSHAD ZAYED has committed and is committing the Subject Offenses. I have further set forth facts that I believe establish probable cause to believe that evidence, instrumentalities, fruits, and contraband of the Subject Offenses are located at the **Subject Premises**,

2

and that evidence and instrumentalities of the Subject Offense are located in **Subject Phone 1** and **Subject Phone 2**.

## PROBABLE CAUSE

5.     In summary, and as set forth in more detail below, in or about August 2021, FBI's Chicago Field Division, Violent Gangs Unit initiated a criminal investigation targeting a suspected seller of firearms operating out of a car wash located in Matteson, Illinois.  During the course of the investigation, investigators discovered ARSHAD ZAYED, the manager of Matteson Car Spa, used his car wash to unlawfully sell firearms.  Additionally, ZAYED also manufactured and sold undetectable or untraceable firearms that were assembled from gun kits without a serial number, commonly referred to as "ghost guns."[1]

6.     More specifically, and as set forth in more detail below, between approximately August 24, 2021, and June 15, 2022, ZAYED, who is not a licensed firearms dealer, sold approximately 36 firearms, including several "ghost guns" and machine guns, on seven different occasions to a confidential source ("CS-2").[2]

---

[1] Based on my training and experience, I know that guns that are assembled from gun kits without a serial number, making them undetectable and/or untraceable, are commonly referred to as "ghost guns."

[2] CS-2 is a high-ranking member of the Black Disciples gang with access to many criminal organizations.  CS-2 has been arrested 20 times and has two criminal convictions, including multiple convictions for narcotics offenses.  In 2018, CS-2 began cooperating with law enforcement in hopes of receiving a more favorable disposition with respect to a narcotics charge.  During the course of his cooperation, law enforcement learned that CS-2 was continuing to engage in narcotics trafficking activity outside the scope of his cooperation.  In April and May 2019, law enforcement confronted CS-2 about that conduct.  CS-2 acknowledged his continued criminal activity and indicated a willingness to cooperate with

Additionally, several of the ghost guns sold by ZAYED qualify as "machine guns" pursuant to the National Firearms Act of 1934. ZAYED used the **Subject Phone** to coordinate each of the transactions described below. In addition, as explained in more detail below, ZAYED utilized the **Subject Premises** to store and manufacture the firearms he sold in a transaction that occurred on or about June 15, 2022.

7.     Based on my training and experience, as well as the training and experience of other law-enforcement members with whom I have consulted, ghost guns are firearms, as defined in Title 18, United States Code, Section 921(a)(3), in that they will and/or are designed to dispel projectiles by explosion. Such weapons are generally manufactured by unlicensed individuals using a variety of prefabricated or partially unfinished firearm parts assembled from various sources, rather than manufactured by an actual or licensed gun manufacturer. Ghost guns do not generally have serial numbers.

---

law enforcement going forward. During a later controlled firearms purchase arranged by CS-2, law enforcement became concerned that CS-2 had warned a confederate about law enforcement surveillance. Law enforcement also became concerned that CS-2 was not generally being truthful about his contacts with his fellow gang members. As a result, law enforcement ceased using CS-2 as a cooperator.

In July 2020, CS-2 was arrested by the Federal Bureau of Investigation Chicago Field Office for narcotics offenses. CS-2 began cooperating with law enforcement in hopes of receiving a more positive disposition relating to federal charges pending against him/her in the Northern District of Illinois as well as state charges pending against him/her in the state of Tennessee. Information provided by CS-2 in this Affidavit has been independently corroborated by law enforcement based on surveillance, consensually recorded phone calls, covert audio/video recordings, and recorded text messages. As such, and despite CS-s's past history of engaging in criminal activity while ostensibly cooperating with law enforcement, law enforcement believes the information provided by CS-2 in this Affidavit to be reliable.

## I.   FACTS SUPPORTING PROBABLE CAUSE THAT ARSHAD ZAYED HAS COMMITTED THE SUBJECT OFENSE

8.     On or about August 6, 2021, CS-2 informed law enforcement that an individual known to him as "Archie" was involved in the illegal sales of firearms at the Matteson Auto Spa located at 21043 South Cicero Ave in Matteson, Illinois.  CS-2 informed investigators that he was approached by "Archie" and the two parties arranged for "Archie" to sell firearms to CS-2.  CS-2 also informed investigators that "Archie," while using phone number (815) 280-3200 ("**Subject Phone 1**"), instructed CS-2 via text message to send him payment for the firearms through Cash App[3] under the user handle "Arshad Zayed," $archiewashmatteson.  From approximately August 24, 2021, through June 15, 2022, ZAYED sold CS-2 approximately 36 firearms, many of which were ghost guns.

### A.   August 24, 2021, Firearms Transaction with CS-2 Coordinated by ZAYED Using Subject Phone 1

9.     On or about August 8, 2021, starting at approximately 4:34 pm, CS-2 and ZAYED, who was using **Subject Phone 1**,[4] exchanged recorded text messages

---

[3] Cash App is a mobile payment service that allows users to transfer money to one another using a mobile phone application, registered to their respective phones. *See* https://cash.app/. (last visited July 21, 2022).

[4] Law enforcement identified ZAYED as the user of this phone number because, as described throughout this affidavit, CS-2 communicated with the user of **Subject Phone 1** to arrange several firearms transactions. During each of the transactions, ZAYED arrived at or was present on the date and time arranged for the firearm transactions and proceeded to sell CS-2 the firearms. Additionally, according to law enforcement databases, including Accurint, ZAYED is associated with **Subject Phone 1**. Finally, CS-2 engaged in several recorded video calls with ZAYED using **Subject Phone 1**, and the individual using **Subject Phone 1** matches the photo on ZAYED's driver's license.

about the potential purchase of firearms.   During the exchange, they discussed the following:

CS-2:          Ok what's price so I know

ZAYED:         Small 850 [$850.00][5] or 900 [$900.00] big 1100 [$1,100]. But if I get more it will be cheaper.

CS-2:          Ok So if you do 4 [firearms] or 8 [firearms] what u get for us

ZAYED:         I missed my flight. 700 [$700.00 per pistol] 900 [$900.00 per rifle]

---

[5] At various points in this affidavit, I will offer my understanding and interpretation of certain statements, including intercepted or recorded conversations, in bracketed comments or during the description of the conversation. My understanding and/or interpretation of these conversations is based upon the contents of the conversations, the context of both prior and subsequent conversations, information received from confidential sources and other law enforcement officials, my knowledge derived from this investigation, and my experience and familiarity with firearms trafficking. Except as noted, the summaries of conversations contained in this affidavit that occurred in relation to the controlled purchase of firearms represent a review of the audio and video recordings and do not represent finalized transcripts of the conversations and may not represent the entire conversation that occurred between the identified individuals

6

10.    Later that day, at approximately 4:34 pm, ZAYED, while using **Subject Phone 1**, sent CS-2 pictures of firearms that were available for purchase, as depicted below:



11.    Based on my training and experience, the training and experience of other law enforcement officers involved in the investigation, and the content and context of the communication, I believe that ZAYED related he would provide CS-2 handguns priced at $700.00 each and rifles priced at $900.00 each, if CS-2 agreed to purchase a larger amount.  ZAYED then provided CS-2 with an example of each kind of weapon through text message.

12.     On or about August 11, 2021, at approximately 9:56 am, CS-2 met with law enforcement and was provided with $1,600.00 in FBI evidence purchase funds, for the purpose of wiring the funds to ZAYED per ZAYED's instruction.  Later that day, at approximately 6:00 pm, CS-2 placed an outgoing consensually recorded phone call to ZAYED who was using **Subject Phone 1**. During the call, CS-2 agreed to purchase a firearm and a rifle and to pay ZAYED using the Cash App link provided by ZAYED.  Specifically, CS-2 stated, "It's seven hundred[6] and nine hundred.[7]  So be looking for it, it should on its way."  ZAYED responded, "Okay cool.  Cause I'm about to go see my guy now."   CS-2 sent $1,600 to ZAYED's Cash App account in two separate payments: one payment of $700 and one payment of $900.

13.     On or about August 12, 2021, at approximately 1:26 pm, CS-2 placed an outgoing consensually recorded phone call to ZAYED who was using **Subject Phone 1**, and explained that the $1,600 he sent to ZAYED's Cash App account had not yet cleared.  Specifically, CS-2 stated, "Archie. Listen listen.  It's gonna clear at 4:30 [p.m], 5 o'clock cuz it takes 24 hours . . . So just give it 'til 4:30, 5 [p.m.]."  In response, ZAYED instructed CS-2 to deposit the funds in ZAYED's checking account with Woodforest National Bank.  Shortly after the call, ZAYED, using **Subject Phone 1**, and CS-2 had the following text message exchange:

ZAYED:      Go to Woodforest bank

---

[6] ZAYED's quoted price for a handgun.

[7] ZAYED's quoted price for a rifle.

8

ZAYED:          https://g.co/kgs/oC8mvR [Orland Hills Branch Location]

CS-2:           Ok perfect send me the account

ZAYED:          Arshad Zayed [ ]02605[8]

                My flight is tomorrow I wasted 2 days on this. I can't waste
                another this place is 2 hrs away from me

CS-2:           Ok cool

14.     Based on my training and experience, the training and experience of other law enforcement officers involved in the investigation, and the content and context of the communication, I believe that CS-2 explained that the money he/she had attempted to wire ZAYED via Cash App was stuck in pending status until the transaction(s) could be verified by the electronic payment service. As a result, CS-2 was later directed by ZAYED to physically deposit the money into his Woodforest bank account, account number ending in 02605.

15.     On or about August 13, 2021, as directed by ZAYED, CS-2 deposited $1,600.00 into ZAYED's Woodford bank account ending in 02605 after the Cash App transaction failed.[9]

---

[8] Records received from Woodforest National Bank list ARSHAD ZAYED as the account holder for account number ending in 02605. The address associated with the account is 21043 South Cicero Avenue, Matteson, Illinois. As discussed in more detail below, 21043 South Cicero Avenue is the address for Matteson Auto Spa, a car wash operated by ZAYED where several of the firearm transactions occurred.

[9] The $1,600 that CS-2 wired to ZAYED's Woodforest bank account is the same $1,600 that CS-2 attempted to send to ZAYED via Cash App.

9

16. On or about August 21, 2021, at approximately 9:30 pm, CS-2 placed an outgoing phone call to ZAYED using **Subject Phone 1**. However, CS-2 was unsuccessful in reaching ZAYED using **Subject Phone 1**. Accordingly, CS-2 called ZAYED who was using 708-XXX-2161,[10] a second phone number previously provided by ZAYED to CS-2. During the consensually recorded call, ZAYED and CS-2 agreed to arrange for a transaction the following Monday. However, ZAYED related to CS-2 that he could not obtain any "big ones" and that he could sell CS-2 "two little ones," meaning that ZAYED could not obtain any rifles but could sell CS-2 two handguns rather than a handgun and a rifle. ZAYED also informed CS-2 that he "tested" the firearms and that "they're good to go," meaning they were operable.

17. On or about August 24, 2021, at approximately 9:47 a.m., CS-2 arrived at a predetermined location where CS-2 and CS-2's vehicle were searched by law enforcement, who found no firearms, illegal contraband, or U.S. currency. CS-2 was then equipped with a covert audio and video recording device. At approximately 9:52 a.m., CS-2 departed the meet location and, while under constant surveillance, traveled to Matteson Auto Spa located at 20143 S. Cicero Avenue in Matteson, Illinois.

---

[10] According to law enforcement databases, including Accurint, (may have to explain LE databases), ZAYED is associated with 708-XXX-2161. Additionally, records received from T-Mobile via subpoena reveal that the subscriber name for 708-XXX-2161 is ARSHAD ZAYED. Finally, based on my review of recorded calls between CS-2 and ZAYED, as well as my review of video recordings of ZAYED (discussed further below), I have become familiar with ZAYED's voice and can identify ZAYED as the person who used 708-XXX-2161 to speak with CS-2 before and after the controlled purchases.

18.     At approximately 9:56 a.m., CS-2 arrived at the Matteson Auto Spa. According to the audio/video recording, CS-2 and ZAYED went to an area of the car wash that appeared to be ZAYED's workshop, wherein ZAYED showed CS-2 the two handheld firearms to be provided in the transaction.   In addition to the firearms, the surveillance footage also captured several tools, including a drill, vice grip, and work bench, which ZAYED can be seen using to assemble the weapons.  The surveillance footage also captured ZAYED's face (still photo from surveillance on left), which appears to match ZAYED's driver's license photo (right).

 

19.     At approximately 10:25 a.m., CS-2 departed the car wash and met with law enforcement at approximately 10:27 a.m. CS-2 provided law enforcement with the following firearms purchased from ZAYED: One (1) black pistol, bearing no identifiable serial number, with "PF940v2 Polymerbo INC Dayton, NV" stamped along the top of the grip portion of the frame and "P80" stamped along the bottom of

the grip portion of the frame ("Firearm #1"); and one (1) brown pistol, bearing no identifiable serial number, with "PF940v2 Polymerbo INC Dayton, NV" stamped along the top of the grip portion of the frame and "P80" stamped along the bottom of the grip portion of the frame ("Firearm #2"), as depicted below:



20. Following the transaction, a financial investigator assigned to the investigation subpoenaed bank records for ZAYED's Woodforest bank account transactional history surrounding the cash deposit of $1,600.00 on August 13, 2021. As a result of the subpoena, the following transactions on August 13, 2021, were noted in the return: (1) a $500 Cash App payment from ZAYED's account to "Arshad Zayed"; (2) a $503 ATM withdrawal; and (3) a $594 payment to US Patriot Armory Inc. A

Google search revealed that US Patriot Armory Inc. is a business located in Apple Valley, California that sells firearms and firearm components.[11]

21.     Before finalizing the transaction described above, CS-2 and ZAYED discussed future firearm purchases.  According to the audio/video recording, ZAYED asked, "how do you want them?" to which CS-2 replied, "two of them I wanted and two of them, huh you know the big ones [rifles] . . . I said four.  Two [handguns] and two [rifles]."     ZAYED responded that he was "fucking behind [schedule on manufacturing weapons]."  CS-2 asked "how much you need so I can get it [the two rifles]?"  ZAYED responded, "just bring me a thousand."  On or about August 25, 2021, at approximately 2:20 pm, CS-2 deposited an additional $1,000.00 in FBI evidence purchase funds into ZAYED's Woodforest bank account, account number ending in 02605 as a down payment in expectation of the future purchase of two (2) rifles, as CS-2 indicated he/she would do during the transaction that occurred the previous day, on August 24, 2021.

---

[11] *See* https://uspatriotarmory.com/ (last visited July 14, 2022).

**B.      October 26, 2021, Firearm Transaction**

22.      On or about October 5, 2021, at approximately 9:48 a.m., ZAYED, using **Subject Phone 1**, sent CS-2 a text message with two photographs depicting the two rifles he agreed to sell to CS-2.



23.      On or about October 12, 2021, at approximately 11:17 a.m., CS-2 sent a text message to ZAYED, using **Subject Phone 1**, stating, "Talk to me how we [the two rifles] looking." ZAYED responded, "Ready . . . Bring me cash come get them."

14

ZAYED, using **Subject Phone 1**, sent another message at approximately 6:04 p.m. the same day stating "They [the rifles] ready." CS-2 responded by asking "U test them good," to which ZAYED responded, "I tested them with 3 [shots] each."

24. On or about October 22, 2021, at approximately 12:32 p.m., CS-2 sent a text message to ZAYED, using **Subject Phone 1**, asking for ZAYED's Cash App. Specifically, CS-2 stated, "Finto have me guy cash app you a gee [$1,000] right fast ok so you can hold them [two rifles] until I get their [there] later ok send me ur cash app now." ZAYED responded by sending his Cash App information: "Arshad Zayed, $archiewashmatteson." CS-2 subsequently sent $1,000 to "Arshad Zayed, $archiewashmatteson" in two separate $500 disbursements. This $1,000 payment was in addition to the $1,000 payment sent by CS-2 to ZAYED's bank account on or about August 22, 2021, for this transaction, as described in paragraph 21, above.

25. On October 26, 2021, at approximately 9:30 a.m., CS-2 arrived at a predetermined location where CS-2 and CS-2's vehicle were searched by law enforcement, who found no firearms, illegal contraband, or U.S. currency. CS-2 was then equipped with a covert audio and video recording device. At approximately 9:38 a.m., CS-2 departed the meet location and, while under constant surveillance, traveled to the Matteson Auto Spa.

26. At approximately 9:41 a.m., CS-2 arrived at and entered the Matteson Auto Spa. As seen and heard on CS-2's audio/video recording device, ZAYED directed CS-2 to a room within the car wash that appeared to be ZAYED's workshop, wherein

ZAYED showed CS-2 the two AR-15-style rifles. ZAYED can be heard and observed on the recording device packing reach rifle into a box, stating, "This is the AR, this is the 9 mm." At approximately 10:27 a.m., CS-2 departed the buy location and met with law enforcement at approximately 10:31 a.m. CS-2 provided law enforcement with two (2) black AR-15 style long guns bearing no identifiable serial numbers ("Firearm #3" and "Firearm #4").





16

27.     Additionally, one of the boxes that ZAYED was observed using to package one of the rifles bore ZAYED's name and the address of the Matteson Auto Spa.



### C.     January 2022 Firearm Transactions

28.     **On** or about December 30, 2021, at approximately 3:20 p.m., while equipped with an audio/video recording device, CS-2 visited ZAYED at the Matteson Auto Spa. As seen and heard on the audio/video recording, ZAYED stated, "As we speak, I got 10 ARs and I got 10 pounds [of cannabis] and I got 10 Glocks.  And I got silencers."  CS-2 responded, "I need 10 ARs and I need 10 silencers.  Imma grab some money."  ZAYED then stated, "I even got short, AR 9 mm [rifles]."  According to the audio/visual recording, ZAYED and CS-2 discussed pricing, and ZAYED told CS-2, "So look, the AR 15s are 12 [$1,200].  The AR 9 [mm]s are 15 [$1,500].  The Glocks

17

are a thousand [dollars]." ZAYED also stated that silencers are "500 [dollars] by themselves."

29.     On or about December 31, 2021, at approximately 10:34 a.m., while equipped with an audio/video recording device, CS-2 visited ZAYED at the Matteson Auto Spa, as follow-up to the meeting conducted between the two on the previous day. As seen and heard on the audio/video recording device, CS-2 agreed to purchase the firearms referenced during their December 30, 2021, meeting. ZAYED related that he was willing to hold onto the weapons after CS-2 informed ZAYED that CS-2 had the ability to obtain $10,000 to pay for the weapons. ZAYED stated that the firearms were ready to be sold, and told CS-2, "Bro, I got them in my storage."

30.     On or about January 5, 2022, at approximately 9:18 a.m., CS-2 arrived at a predetermined location where CS-2 and CS-2's vehicle were searched by law enforcement, who found no firearms, illegal contraband, or U.S. currency. At approximately 9:30 a.m., investigators observed CS-2 conduct a FaceTime call with ZAYED to confirm that the firearms CS-2 ordered on December 30 and 31, 2021, were ready to purchase. CS-2 was then provided with approximately $10,000 in FBI funds and was equipped with a covert audio and video recording device. At approximately 9:36 a.m., CS-2 departed the meet location and, while under constant surveillance, traveled to the Matteson Auto Spa.

31.     At approximately 9:42 a.m., CS-2 visited ZAYED at the Matteson Auto Spa in order to complete the transaction negotiated on December 30 and 31, 2021.

18

CS-2 informed ZAYED that CS-2's buyer gave CS-2 "10 bucks [thousand dollars] now" and that the buyer "want everything we got." ZAYED then informed CS-2 that most of the items were not ready for sale. Specifically, ZAYED noted, "I gotta wait everything. Two days." CS-2 responded by asking, "You ain't got none?" ZAYED answered, "I got the AR 9[mm]s and the ARs, but the silencers I'm havin' problems with, they're not working a hundred percent." ZAYED asked CS-2 to find out if CS's buyers could "wait til Friday [January 7, 2022]" to "pick up everything in one box." CS-2 told ZAYED that he could come back later in the day to see if the guns were ready, and ZAYED responded, "Okay I'll have them waiting for you at 2:30 [p.m.]. I'll bring you what I have, and then we'll just go from there."

32. At approximately 10:28 a.m., as seen and heard on the audio/video recording device, CS-2 told ZAYED that he would take two handguns that day and come back for the rest of the items. ZAYED agreed and stated, "I'll give you the two handguns." A few minutes later, ZAYED can be seen tightening a silencer onto the barrel of a dark handgun and quotes the price as "23 [$2,300]." CS-2 attempted to negotiate the price down, arguing, "Nah. 21, 22 [$2,200]." However, ZAYED responded, "a thousand [$1,000 for a handgun], thousand [$1,000 for a handgun], plus 5 [$500 for the silencer], that's 23 [$2,300]." CS-2 can be seen and heard counting out $2,300 and handing it to ZAYED in exchange for the firearms and silencer.

19

33.     At approximately 10:53 a.m., CS-2 departed the buy location and, while under constant surveillance, met with law enforcement at approximately 10:58 a.m. CS-2 provided law enforcement with one (1) blue steel 9 mm semi-automatic handgun bearing no identifiable serial number with a green handle and "P80" stamped along the bottom of the grip portion of the frame ("Firearm #5") and one (1) blue steel 9 mm semi-automatic pistol bearing no identifiable serial number with a silencer attached ("Firearm # 6").  CS-2 also returned $7,700 of the $10,000 of FBI purchase funds provided by law enforcement.



34.     On or about January 11, 2022, at approximately 8:16 a.m., CS-2 sent an outgoing text message to ZAYED who was using **Subject Phone 1** and stated "heading your way next 30 min lunch on you so b on point." ZAYED subsequently replied "Ok." At approximately 9:07 a.m., CS-2 arrived at a predetermined meet

20

location where CS-2 and CS-2's vehicle were searched by law enforcement, who found no firearms, illegal contraband, or U.S. currency. CS-2 was then provided with approximately $3,250 in FBI funds and was equipped with a covert audio and video recording device. At approximately 9:13 a.m., CS-2 departed the meet location and, while under constant surveillance, traveled to the Matteson Auto Spa.

35. At approximately 9:16 a.m., CS-2 arrived at Matteson Auto Spa to meet with ZAYED to conduct the firearms transaction. According to the audio/visual recording device, ZAYED asked, "What [guns] are you taking today." CS-2 responded, "I'm taking them two [rifles] and those two pistols for the 4250 [$4,250]." ZAYED then asked, "Okay are you taking these now?" to which CS-2 indicated that he was. ZAYED replied, "Ok let me clean them all up." ZAYED was observed wearing gloves and cleaning several firearms before placing them in a box for CS-2.

 

21

36.     A few minutes later, ZAYED is seen on video placing the firearms in a large box and can be observed removing a shipping label from the box, stating, "I just don't want my name on it.  You never know bro." As ZAYED was placing the firearms in a box, CS-2 asked ZAYED if ZAYED would have an additional "silencer, two Ks [long guns] and two handguns" ready by the weekend.  ZAYED replied, "I'll have 'em by um, by Thursday."

37.     A couple of minutes later, ZAYED was observed counting the money and stated, "It's 31 [$3,100]."  CS-2 responded by stating, no it's not.  Man you crazy." ZAYED repeated that he counted only "3150 [$3,150],"[12] and the agreed upon price for all four firearms was $4,200.  ZAYED told the CS-2 to "take [the firearms] and leave the 1911 [one of the handguns] and come back with the 1 [$1,000.00] and I'll give you the 1911."  CS-2 agreed to "take the two big ones" along with the 1911 and to "leave the brown one [second handgun]."

38.     At approximately 9:53 a.m., CS-2 left the Matteson Auto Spa to meet with law enforcement.  CS-2 met with law enforcement at approximately 9:57 a.m. and handed to them the purchased firearms, which included two rifles and a Remington 1911 pistol.  Law enforcement then provided CS-2 with an additional $1,000 to purchase the remaining firearm from ZAYED.

---

[12] Although ZAYED claims to have counted $3,150, FBI provided CS-2 with $3,250. Additionally, and as explained below, when CS-2 returned to the car wash with an additional $1,000, ZAYED accepted payment, completing the transaction that ZAYED  priced at $4,250. Finally, when CS-2 went to FBI to seek the additional $1,000 in funds to complete the transaction and purchase the remaining firearm—as explained below—he was searched by investigators who did not find any cash on him.

39.     At approximately 10:19 a.m., CS-2 departed the meet location and, while under constant surveillance, traveled back to the Matteson Auto Spa. At approximately 10:21 a.m., CS-2 returned to the Matteson Auto Spa and handed ZAYED the additional $1,000 for the remaining firearm. According to the video surveillance, ZAYED counted the money and then handed CS-2 a white postal service box with the additional handgun inside.

40.     At approximately 10: 28 a.m., CS-2 departed the Matteson Auto Spa and, while under constant surveillance, met with law enforcement at approximately 10:30 a.m. CS-2 was searched and was found to have $20 in gas money, given to him by ZAYED, as observed on CS-2's audio/video recording device. CS-2 provided law enforcement with the additional firearm that he purchased from ZAYED. In total, CS-2 purchased one (1) Remington 1911 .45 caliber semi-automatic handgun bearing serial number RHD003471 ("Firearm #7"); one (1) .45 caliber semi-automatic handgun containing a Glock upper bearing serial number BVXY326[13] and a lower receiver with "P80" stamped along the bottom of the handle grip portion of the frame ("Firearm #8"); one (1) .556 caliber AR-15 style long gun bearing no identifiable serial number ("Firearm #9"); and one (1) 9 mm AR-15 style long gun bearing no identifiable serial number ("Firearm #10") from ZAYED on January 11, 2022.

---

[13] Investigators determined that the Glock slide bearing serial number BVXY326 was ordered from a firearm and firearm accessories store in Evansville, Indiana on or about January 5, 2022, through eBay, and was shipped to the Matteson Auto Spa in exchange for $770. The buyer's name was listed as "Archie Mohammad" and the listed phone number for the buyer was the **Subject Phone**. The Glock slide was delivered on or about January 10, 2022.



**D.    February 3, 2022, Transaction**

41.    On or about January 24, 2022, starting at approximately 11:54 a.m., CS-2 engaged in a series of text message communications with ZAYED who was using **Subject Phone 1**. During the conversation, ZAYED noted that he had firearms available for purchase, and stated, "I'm selling these today." ZAYED's text message was accompanied by a picture of a rifle:



42.     Upon receiving this information, CS-2 responded by making an inquiry as to the availability of additional hollow point ammunition for the Remington 1911 that was purchased on January 11, 2022 (Firearm #7).

43.     On or about January 27, 2022, at approximately 11:00 am, ZAYED, while using **Subject Phone 1**, engaged in a series of text messages with CS-2 regarding other firearms that ZAYED was willing to sell CS-2.  Specifically, ZAYED noted that "1 ar [AR-15 style rifle] will be ready today waiting on mailman. But mac [MAC 11 firearm] 3 Gloc[k s] 1ar [AR-15 style rifle] ready."  ZAYED also sent a picture of the MAC 11 firearm via text.  CS-2 responded by advising ZAYED that CS-2's buyer wanted all of the firearms ZAYED had available, including the AR that ZAYED was waiting to arrive ("waiting on mailman"): "ok he [customer] want them all. He said

25

get the AR [yet to be assembled] ready. He gonna bring me the money tonight for them all ok. He want them and the AR. Ready ok." ZAYED responded, "ok."

44.     Based on my training and experience, the training and experience of other law enforcement officers involved in the investigation, and the content and context of the communication I believe that CS-2 and ZAYED discussed the future sale of firearms that ZAYED claimed to be in his possession, as well a ghost gun kit that ZAYED was expecting to arrive via shipment service.

45.     On or about February 1, 2022, at approximately 5:58 p.m., CS-2 engaged in a series of text messages with ZAYED who was using **Subject Phone 1** and attempted to negotiate the total asking price for the aforementioned firearms down to $5,500 stating, "Can I get all that for 5500 [$5,500]." ZAYED, using **Subject Phone 1**, responded by stating that the total price would be $5,800. CS-2 confirmed that he was able to obtain $5,800 to purchase the firearms.

46.     On or about February 2, 2022, at approximately 1:30 p.m., CS-2 contacted ZAYED, who was using **Subject Phone 1** to arrange a time for the agreed upon transaction. CS-2 and ZAYED settled on the next day at approximately 11:00 a.m. At approximately 2:20 p.m., ZAYED while using **Subject Phone 1** instructed CS-2 to download SIGNAL,[14] an encrypted messaging application on his/her phone.

---

[14] SIGNAL is an "end-to-end encryption service" that provides private messaging, internet calling, and other services to its users. *See* signal.org (last visited July 20, 2022). In my training and experience, SIGNAL can be used to evade detection and surveillance by law enforcement.

At approximately 9:34 pm, CS-2 again contacted ZAYED who was using **Subject Phone 1** to confirm that there had been no change in the agreed upon time of the transaction.

47.     The following day, February 3, 2022, at approximately 10:53 a.m., CS-2 met with FBI and was provided with $5,800 in FBI evidence purchase funds.  CS-2 was also equipped with a covert audio/video recording device. Prior to providing CS-2 with the money and the recording device, CS-2 was searched by investigators and did not possess any firearms or U.S. currency. At approximately 11:15 a.m., CS-2 traveled, while under constant surveillance, to the area of the Matteson Auto Spa. When CS-2 arrived at Matteson Auto Spa, ZAYED was not there, so CS-2 proceeded to wait for ZAYED to arrive.

48.     While CS-2 waited for ZAYED to arrive at Matteson Auto Spa, investigators conducted surveillance on ZAYED at his residence located on the 9200 block of Quail Court in Orland Hills, Illinois ("ZAYED Residence").[15]     At approximately 11:09 a.m., ZAYED departed the ZAYED Residence in a white Volvo with a temporary Ohio license plate, M375426 ("Subject Vehicle").  Investigators observed the Subject Vehicle arrive at Sheepdog Firearms, located at 14819 West 101st Avenue, in Dyer, Indiana at approximately 11:49 a.m.  A Google search revealed that Sheepdog Firearms is a business that sells firearms and firearm

---

[15] According to the law enforcement databases, ZAYED is associated with the ZAYED Residence.  Additionally, ZAYED Residence is listed as the address on ZAYED's Illinois driver's license.

components.[16] Investigators observed ZAYED exit Sheepdog Firearms at approximately 11:55 a.m., at which time ZAYED entered the Subject Vehicle and drove away.

49.     At approximately 1:00 p.m., investigators observed ZAYED arrive at Matteson Auto Spa in the Subject Vehicle. ZAYED entered the car wash and met with CS-2. According to the audio/video recording device, when CS-2 pulled out the money to pay for the firearms, ZAYED stated that "the big one [rifle] is in [his girlfriend's] trunk" and that his girlfriend was, at that time, at "work at the hospital." ZAYED told CS-2 that the gun was in his girlfriend's trunk because he "just had to take it home to test it. That's the only reason that's in her trunk." CS-2 and ZAYED then agreed that CS-2 would wait at the car wash while ZAYED retrieved the rifle from his girlfriend's car.

50.     At approximately 12:43 p.m., investigators observed (and CS-2's audio/video recording device captured) ZAYED enter the Subject Vehicle and drive away from the car wash. Investigators observed the Subject Vehicle return to the car wash at approximately 12:59 p.m. When ZAYED returned, the surveillance device worn by CS-2 captured ZAYED assembling the firearms at a desk in the office of the car wash. While ZAYED was assembling the firearms, CS-2 asked, "one, two, three. Two ARs right? We missin a Glock. What we missin now?" According to the

---

[16] *See* https://www.sheepdogfirearms.com/home (last visited July 15, 2022).

surveillance device, ZAYED responded, "Nothing, we got 1, 2, 3 [Glocks] and two ARs."

51.    At approximately 1:32 p.m., while under constant surveillance, CS-2 departed the car wash and subsequently arrived at a predetermined meet location with law enforcement at approximately 1:41 p.m., where CS-2 and CS2's vehicle were searched for contraband and excess U.S. Currency, with none found. CS-2 provided law enforcement with the following firearms that he purchased from ZAYED in exchange for $5,800, as captured on his surveillance device:

- One (1) 9 mm MAC 11 fully automatic option handgun bearing serial number 89-0031705 ("Firearm #11");

- One (1) .40 caliber semi-automatic Smith & Wesson handgun bearing serial number DWZ2418 ("Firearm #12");

- One (1) .556 caliber black short barrel AR-15 style weapon bearing no identifiable serial number ("Firearm #13");

- One (1) .556 caliber black AR-15 style long gun (lacking a butt stock) bearing no identifiable serial number (Firearm #14")

- One (1) .22 caliber semi-automatic handgun slide bearing no identifiable serial number, manufactured by Advantage Arms, Inc. COEUR d' ALENE, ID USA and containing a lower receiver with "P80" stamped along the bottom of the handle grip portion; and

- Several rounds of ammunition and two (2) .40 caliber magazines.



### E. March 25, 2022, Transaction

52. On or about March 11, 2022, CS-2 related to investigators that he was contacted by ZAYED, who was using phone number 626-XXX-0545. Specifically, CS-2 told investigators that ZAYED used the -0545 number to place a FaceTime call to CS-2 to advise CS-2 that he (ZAYED) had three ARs and three pistols available for purchase. CS-2 also informed investigators that, on or about March 13, 2022, CS-2 had another FaceTime call with ZAYED, who was using **Subject Phone 1**. During this March 13, 2022, FaceTime call, CS-2 negotiated the price of the above referenced firearms from $8,000.00 down to $7,500.00.

53. On or about March 22, 2022, CS-2 informed investigators that ZAYED, while using **Subject Phone 1**, had increased the total amount of firearms available

for purchase to a total of five Assault Rifles, five handguns, and three silencers, for the total price of $14,000.00. Upon inquiry, ZAYED, using **Subject Phone 1**, also related to CS-2 that he had test fired the weapons to ensure their functionality. Specifically, ZAYED stated, "I tested every one and they flawlessly [worked]."



54.     On or about March 24, 2022, at approximately 7:16 pm, ZAYED, using **Subject Phone 1**, and CS-2 arranged the purchase of the firearms to take place the following morning at the Matteson Auto Spa.

55.     On or about March 25, 2022, at approximately 9:45 a.m., CS-2 arrived at a predetermined meet location where CS-2 and CS-2's vehicle were searched by law enforcement, who found no firearms, illegal contraband, or U.S. currency. Law enforcement provided CS-2 with $12,000 for the purchase and equipped CS-2 with an audio/video recording device. At approximately 10:30 a.m., CS-2 departed the meet location and, and while under constant surveillance, traveled to the area of the Matteson Auto Spa.

56.     At approximately 10:36 a.m., CS-2, equipped with an audio/video recording device, arrived at the Matteson Auto Spa parking lot and entered the passenger side of the Subject Vehicle with ZAYED seated in the driver's seat. According to the audio/video recording, when CS-2 entered the vehicle, ZAYED asked, "you got the money?" CS-2 responded that he had the money and approximately two minutes later, was observed counting approximately $12,000 in cash in front of ZAYED. At approximately 10:44 a.m., CS-2 asked how he would receive the firearms and ZAYED responded, "It's in a brown box."

57.     At approximately, 10:45 a.m., CS-2 was observed exiting the Subject Vehicle and reentering his own vehicle. Several minutes later, at approximately 10:56 a.m., ZAYED approached the driver's side of CS-2's vehicle to speak with CS-2.

ZAYED stated, "everything in the picture is in that box" and that the box contains "six big ones [rifles] five little ones [handguns]."

58.     Additionally, at approximately 10:55 a.m., investigators conducting surveillance at Matteson Auto Spa observed ZAYED exiting the car wash and placing a large, brown cardboard box into the trunk of the vehicle driven by CS-2.



59.     At approximately 10:57 a.m., while under constant surveillance, CS-2 departed the car wash and subsequently arrived at a predetermined meet location with law enforcement at approximately 11:06 a.m., wherein CS-2 provided law enforcement with the following firearms purchased from ZAYED after removal from the above-referenced box:

- One (1) Ruger, LCR, .38 Special +P revolver, with a defaced serial number ("Firearm #15");

- One (1) 9mm semi-automatic pistol, Polymer PF940C, bearing no identifiable serial number ("Firearm #16");

- One (1) .357 caliber pistol with a Glock magazine bearing no identifiable serial number ("Firearm #17");

- One (1) .40 caliber Smith & Wesson model M&P Shield M2.0 with a defaced serial number ("Firearm #18");

- One (1) 9mm CD Defense, PAK-9 pistol bearing serial number RON2024400 ("Firearm #19");

- Three (3) 7.62 x 39 caliber rifles, with 14" barrels, bearing no identifiable serial number ("Firearm #20-22"). As described in more detail below, Firearm #20-22 qualify as machine guns, pursuant to the National Firearms Act of 1934;

- One (1) 5.56 x 45 caliber rifle with a 16" barrel bearing no identifiable serial number ("Firearm #23");

- One (1) 5.56 x 45 caliber rifle with a 14" barrel bearing no identifiable serial number ("Firearm #24");

- One (1) Durkin Precision flash suppressor 12" blue steel;

- One (1) AB Arms flash suppressor 12"; and

- One (1) box of Federal 180 grain auto live ammunition, 10mm cal., containing 36 live rounds.



**F.    June 15, 2022, Transaction**

60.    On or about March 26, 2022, at approximately 12:22 a.m., CS-2 contacted ZAYED via text using **Subject Phone 1** to remind ZAYED that ZAYED still owed CS-2 an AR-style weapon.  ZAYED responded using **Subject Phone 1** by sending a picture of an AR-style weapon and stating "Baddest one of all it's my personal one"



61.    On or about May 9, 2022, starting at approximately 11:43 p.m. and continuing into May 10, 2022, CS-2 engaged in a series of text messages with ZAYED who was using **Subject Phone 1**. During the exchange, ZAYED indicated that he had completed the assembly/manufacturing of a few handguns and was still in the process of assembling more.



62.     On or about May 28, 2022, starting at approximately 1:50 a.m., CS-2 engaged in a series of text messages with ZAYED who was using **Subject Phone 1**. During the exchange, ZAYED indicated that he had firearms that were available for purchase.  ZAYED also provided CS-2 with a series of photographs depicting the

weapons and provided a price for all of the merchandise that ZAYED was looking to sell.



63.     Specifically, ZAYED informed CS-2 that he had "9 small [handguns] . . . 4 big [rifles] 6 silence[ers] tote [tons] of ammo."  ZAYED, using **Subject Phone 1**, quoted the total price for all of the merchandise as "No less than 22k [$22,000]."

38

64.     On or about June 7, 2022, starting at approximately 6:49 p.m., CS-2 continued to engage in a series of text messages with ZAYED, who was using **Subject Phone 1**, about a potential firearms transaction. During the exchange, ZAYED provided CS-2 with a series of photographs depicting the weapons that were being offered for sale to CS-2 by ZAYED. ZAYED sent CS-2 a video of multiple firearms that were fully assembled.



65.     At approximately 7:02 p.m., ZAYED sent CS-2 a text message using **Subject Phone 1** and informed CS-2 that he was willing to sell "10 [firearms depicted] in video, 4 [firearms depicted] in pics, 500 [rounds of] ammo and 4

silence[ers]" for a total of "19k [$19,000]." CS-2 replied to the message a short time later and asked, "Can we do everything for 14 [$14,000] for my guys [proposed buyers] they jus said." ZAYED, using **Subject Phone 1**, rejected CS-2's counteroffer, and replied "Ok. We do everything for 15 [$15,000] beside the ruger [handgun]." ZAYED also informed CS-2 that "Everything ready [fully assembled]."

66.     On or about June 8, 2022, at approximately 11:17 a.m., ZAYED, using **Subject Phone 1**, sent another text message to CS-2 stating, "I'll giving you everything for 16k [$16,000]. Lowest I can possibly do. 10 small [handguns]. 4 big [rifles]. All ammo and 4 silence[ers]."

67.     Later that day, starting at approximately 6:50 p.m., CS-2 engaged in a series of text messages with ZAYED, who was using **Subject Phone 1**, to continue negotiations over a potential firearms transaction. Specifically, CS-2 informed ZAYED to "get everything together at wash [Matteson Auto Spa] n I'll.be their [there] ASAP working on rest cash now ok." ZAYED, using **Subject Phone 1**, replied "Not at wash [Matteson Auto Spa] down the street lmk what time. You getting 25k [$25,000] worth [of firearms and firearm accessories] For 16 [$16,000]. CS-2 responded, "I don't feel comfortable bro only at wash [Matteson Auto Spa] you know it man I don't like no where else bro." ZAYED replied, "Ok At wash [Matteson Auto Spa]."

68.     Based on my training and experience, the training and experience of other law enforcement officers involved in the investigation, and the content and

context of the communication, I believe that ZAYED indicated that he had completed the assembly/manufacture of the firearms at issue. Further, based on the context of the text exchange above and based on surveillance described in more detail below, I believe that ZAYED was using a different location other than the Matteson Auto Spa to store/manufacture his weapons.

69. On June 9, 2022, at approximately 7:06 p.m., CS-2 met with ZAYED at the Matteson Auto Spa, which appeared to be closed for business. According to CS-2, CS-2 emphasized to ZAYED the need to view the firearms at question and confirm their functionality. CS-2 informed investigators that ZAYED indicated he was utilizing a storage unit and would take CS-2 to physically inspect the weapons the following day, June 10, 2022.

70. On or about June 10, 2022, starting at approximately 6:46 p.m., CS-2 met with ZAYED at the closed Matteson Car Wash location in order to physically inspect the weapons. Upon concluding the meeting with ZAYED, and as seen on CS handheld audio/video recording device, CS-2 traveled with ZAYED to the Cube Smart Self Storage facility located at 571 W. 24th Street in Chicago Heights, Illinois, and, together, they entered Storage Unit 1222 ("Storage Unit"). While CS-2 was present at the Storage Unit, he observed and inspected nine (9) handguns and four (4) AR-style rifles inside of the unit. When CS-2 left the Storage Unit with Zayed, the firearms stayed inside the Storage Unit.

41

71.    On or about June 14, 2022, ZAYED, using **Subject Phone 1**, and CS-2 engaged in a series of text messages to finalize the firearm transaction.  Specifically, at approximately 12:58 p.m., CS-2 sent a text to ZAYED using **Subject Phone 1** and stated, "Ok you get [let] me know where so I can come [purchase the firearms] ok." ZAYED responded, "10 min[inutes] from wash [Matteson Auto Spa] let me know when.  Not storage [Storage Unit] it's a new low key shop."  ZAYED then sent CS-2 the photograph below, which depicts several firearms and what appear to be silencers on a table:



72. CS-2 asked ZAYED, "Ok where you at," to which ZAYED, using **Subject Phone 1**, responded "This the new spot in Steger by chi heights." CS-2 asked for the address, and ZAYED replied, "3616 Union Ave, Steger, IL 60475" (the "**Subject Premises**").

73. At approximately 10:24 p.m., ZAYED, using **Subject Phone 1**, instructed CS-2 to meet him at the **Subject Premises** on June 15, 2022, at 7:00 a.m. to complete the transaction.

74. Based on my training and experience, the training and experience of members of law enforcement assigned to the investigation, the overall context and the totality of circumstances to include surveillance observations of the closed Matteson Auto Spa location, I believe that ZAYED informed CS-2 that he had begun to utilize a new building, a "new low key shop" approximately "10 min[utes] from [the] was [Matteson Auto Spa]," to manufacture and sell ghost guns and machine guns. The 3616 Union Avenue location in Steger, Illinois [provided by ZAYED as explained below] is an approximately 15-minute drive south west of the Matteson Auto Spa in Matteson, Illinois.

75. On or about June 15, 2022, at approximately 8:54 a.m., CS-2 sent a text to ZAYED, using **Subject Phone 1**, and informed ZAYED that he was "Heading that way [to the **Subject Premises**] next 30 min." ZAYED responded, "Good morning I'll be at storage [Storage Unit] in 20. Call me when your close."

76. On June 15, 2022, at approximately 9:00 a.m., mobile surveillance was

initiated on ZAYED. At approximately 9:26 a.m., investigators observed ZAYED, who was driving the Subject Vehicle, arrive at the Cube Smart Storage Facility located at 571 W. 14th Street in Chicago Heights ("Cube Smart"), wherein the Storage Unit is housed. Investigators observed ZAYED exit the Subject Vehicle and enter the Cube Smart facility shortly after arriving.

77.     At approximately 9:55 a.m., CS-2 met with law enforcement at a predetermined location wherein CS-2 was equipped with audio/video recording device and $16,000 in FBI evidence purchase funds. CS-2 was searched for firearms, contraband, and U.S. currency and none was found. CS-2 was instructed by law enforcement to purchase the additional Ruger referenced previously by ZAYED on June 7, 2022. At approximately 10:09 a.m., CS-2 departed the predetermined location and, and while under constant surveillance, traveled to the area of the **Subject Premises** where CS-2 and ZAYED agreed to meet. Investigators observed CS-2 arrive at 3636 Union Avenue in Steger, Illinois, approximately 300 feet from the **Subject Premises**. At approximately 10:15 a.m., ZAYED was observed leaving the Cube Smart in the Subject Vehicle, and he arrived at 3636 Union Avenue at approximately 10:25 a.m., and parked adjacent to CS-2.

78.     Prior to ZAYED's arrival to the location of CS-2's parked location, CS-2 received an incoming call from ZAYED using **Subject Phone 1** and, as heard on the recording device provided to CS-2 by law enforcement, they discussed the following:

ZAYED:      Aye, where you sitting, where are you exactly .

44

CS-2:      I'm right at the address, right at the parking lot they working at [3636 Union Ave].

ZAYED :    No, that's not it [3616 Union Avenue is the correct address]. But I'll be right there right now.

CS-2:      Okay you see it.

Subsequently, upon ZAYED's arrival to the location of CS-2, according to the audio/video recording device, CS-2 and ZAYED agreed to relocate to the Cube Smart to conduct the transaction because, as ZAYED stated, "Steger is hot [suspected law enforcement presence in the area]." ZAYED continued, stating "Yea, we better off over there [at Cube Smart]."

79.    Investigators conducting surveillance observed CS-2, driving CS-2's vehicle, and ZAYED, who was driving the Subject Vehicle, depart from the Steger location at approximately 10:27 a.m. At approximately 10:39 a.m., investigators observed CS-2 and ZAYED arrive at the Cube Smart. ZAYED and CS-2 were observed exiting their respective vehicles and entering the Cube Smart at approximately 10:43 a.m.

80.    At approximately 10:49 a.m., investigators observed ZAYED and CS-2 exit the Cube Smart together, and ZAYED was observed pushing a large cardboard box on what appeared to be a dolly.



81.     A few moments later, ZAYED was observed lifting and placing the above-referenced cardboard box into the rear passenger seat of CS-2's vehicle.



82. At approximately 10:55 a.m., while under constant surveillance, CS-2 departed the Cube Smart and subsequently arrived at a predetermined meet location with law enforcement at approximately 11:34 a.m., wherein CS-2 provided law enforcement with the following firearms and firearm accessories purchased from ZAYED.

- One (1) blue steel assault style rifle, bearing no identifiable serial number, bearing U.S.M.C. with a bulldog logo on the right magazine port, containing a "MAGPUL" handle accompanied by one "Strike Industries 5.56x45" caliber magazine ("Firearm #25");

- One (1) blue and gray steel assault style rifle, bearing no identifiable serial number, with a yellow and green snake emblem with the words "don't tread on me" on the front flash suppressor accompanied by one "PMAG 30 7.62x35" caliber magazine ("Firearm #26");

- One (1) Smith & Wesson, model MP45 Shield .45 caliber semi-automatic handgun, bearing a defaced serial number, accompanied by one Smith & Wesson .45 auto magazine ("Firearm #27");

- One (1) gold-speckled gray steel assault style rifle, bearing no identifiable serial number, with one black handle ("Firearm #28");

- One (1) gold and blue steel handgun, bearing no identifiable serial number, with a "PF 45 Polymer, Inc." black receiver accompanied by one Glock 10mm magazine ("Firearm #29");

- One (1) Kel-Tech, model CP33, 22LR Caliber, semi-automatic handgun, bearing serial number MGJ60 accompanied by two clear Kel-Tech magazines ("Firearm #30");

- One (1) blue steel semi-automatic handgun, bearing no identifiable serial number, accompanied by one 40 31RD .40 caliber extended magazine ("Firearm #31");

- One (1) teal and blue steel assault style rifle, bearing no identifiable serial number, with one gold and black speckled "MAGPUL" handle accompanied by one "PMAG 30 5.56x45" magazine; ("Firearm #32")

47

- One (1) blue steel Glock 43x handgun, bearing a partially defaced serial number, accompanied by one Shield Arms 9mm magazine with a gold plate ("Firearm #33");

- One (1) gold and blue steel finish "Dynamic MRK II", semi-automatic handgun, bearing no identifiable serial number, with "PF940V2 Polymer80, INC" on black handle, accompanied by one "PMAG 21 GL9 MAGPUL" "9x19" magazine ("Firearm #34");

- One (1) gold and blue steel .45 caliber ACP semi-automatic handgun, bearing no identifiable serial number, with a gold handle ("Firearm #35");

- One (1) blue steel finish with a green receiver semi-automatic .45 caliber handgun, bearing no identifiable serial number, and Glock slide ("Firearm #36"); and

- One (1) black silencer; one (1) black and gray steel silencer; and one (1) stainless steel silencer.




### G. Testing of the Firearms Purchased from ARSHAD ZAYED between August 24, 2021, and June 15, 2022

83. On or about June 3, 2022, investigators submitted for testing the firearms purchased by CS-2 from ZAYED on or about August 24, 2021; October 26, 2022; January 11, 2022; February 3, 2022; and March 25, 2022, to a certified forensic examiner from the CPD Crime Laboratory Division to determine their functionality.

Specifically, the CPD Crime Laboratory Division conducted an examination on Firearm #1-4[17] and 7-24 and determined the following:

- Firearm #1-4, 7-10, 12-13, 16, and 18-19 successfully fired two (2) rounds of ammunition and were classified as "will fire," thus classifying them as working firearms;

- Firearm #11 successfully fired two (2) rounds of ammunition and was classified as "will fire," thus classifying it as a working firearm. Additionally, Firearm #11 will fire once when the trigger is pulled and again once the trigger is released;

- Firearm #14 was found to be missing the buffer, buffer action spring, lock nut, spacer, buffer retaining spring, and buffer retainer. However, the firearm can be made to fire by opening the bolt and loading a live cartridge, closing the bolt, forcing the bolt to lock into battery, removing the takedown pin, tilting open the upper receiver, cocking and resetting the trigger, closing the upper receiver, reinstalling the takedown pin, and pulling the trigger. As a result, the firearm was classified as "will fire," thus classifying it as a working firearm;

- Firearm #15 is a revolver and was found to be in good working order and capable of discharge and was classified as "will function," thus classifying it as a working firearm;

- Firearm #17 was installed with an incorrect pin. Once a correct firing pin was installed, Firearm #17 successfully fired two (2) rounds of ammunition and was classified as "will fire," thus classifying it as a working firearm; and

- Firearm #20-24 successfully fired two (2) rounds of ammunition and were classified as "will fire," thus classifying them as working firearms. Additionally, Firearm #20-24 had installed drop-in auto-sear, which would allow the firearms to shoot automatically more than one shot, without manual reloading, by a single function of the trigger, thus classifying them as machineguns as defined by the National Firearms Act of 1934. When tested, Firearm #20 fired three cartridges with three separate trigger functions. However, Firearm #21 fired two cartridges

---

[17] The firearms purchased by CS-2 from ZAYED on or about January 5, 2022 (Firearm #5 and Firearm #6) have not yet been submitted for testing to ascertain their functionality.

with a single trigger function. Firearm #22-24 fired three cartridges with a single trigger function.

84. Additionally, on or about June 15, 2022, investigators submitted for testing the firearms purchased by CS-2 from ZAYED on or about June 15, 2022, to a certified forensic examiner from the CPD Crime Laboratory Division to determine their functionality. Specifically, the CPD Crime Laboratory Division conducted an examination on Firearm #25-36 and determined the following:

- Firearm #25, 27-30, and 33-34 successfully fired two (2) rounds of ammunition and were classified as "will fire," thus classifying them as working firearms;

- Firearm #26 was found to be missing the buffer, buffer action spring, lock nut, spacer, buffer retaining spring, and buffer retainer. However, the reporting technician successfully fired two (2) rounds of ammunition after installation of charging handle, buffer, and buffer action spring, and was thus classified as "will fire," thus classifying it as a working firearm. Additionally, the technician had to manually reset the bolt between test shots. Finally, Firearm #26 had installed a drop-in auto-sear, which would allow the firearm to shoot a three-round burst, without manual reloading, by a single function of the trigger, thus classifying them as machineguns as defined by the National Firearms Act of 1934;

- Firearm #31 successfully fired two (2) rounds of ammunition and was classified as "will fire," thus classifying it as a working firearm. For safety, the technician replaced the personally made frame with a forensic firearms lab reference frame for live test firing;

- Firearm #32 successfully fired two (2) rounds of ammunition and was classified as "will fire," thus classifying it as a working firearm. However, the buffer and buffer spring are missing from the upper receiver and the trigger guard is missing from the lower receiver;

- Firearm #35 successfully fired two (2) rounds of ammunition and was classified as "will fire," thus classifying it as a working firearm. The

firearm was made to fire by manually cocking the hammer to the rear and releasing the hammer; and

- Firearm #36 was inoperable as received.

### H. ARSHAD ZAYED and CS-2 Arrange to Meet on July 20, 2022, at the Subject Premises Using Subject Phone 2

85. On or about July 19, 2022, at approximately 2:45 p.m., during a consensually recorded call, CS-2 and ZAYED, who was using phone number (872) 251-2555 ("**Subject Phone 2**"),[18] spoke by phone about a potential firearms transaction. Specifically, CS-2 informed ZAYED that he was looking to make another purchase on behalf of his "guys [customers]." In response, ZAYED stated, "I got like eight, eight, eight or nine units [firearms] but not the ones I build [ghost guns]. You

---

[18] **Subject Phone 2** is believed to be used by ZAYED based on a number of factors. First, the voice of the person using **Subject Phone 2** matches the voice of the person using **Subject Phone 1**, who investigators know to be ZAYED. Second, the voice of the person using **Subject Phone 2** matches the voice of ZAYED that is heard on the audio and recording device worn by CS-2 during the six transactions described above. Finally, CS-2 communicated with the user of **Subject Phone 2** to arrange to meet on or about July 20, 2022, to discuss a firearm transaction. During the meeting on July 20, 2022, ZAYED arrived at the **Subject Premises** to discuss a firearm transaction, as discussed in more detail below.

want pictures?" CS-2 agreed, and ZAYED, using **Subject Phone 2**, sent several photos of handguns, including the images below.

  

86. On July 20, 2022, at approximately 12:05 a.m., CS-2 and ZAYED, who was using **Subject Phone 2**, spoke again on the phone about a potential firearm transaction. During this consensually recorded conversation, ZAYED stated that "I grabbed everything [from] my storage [Storage Unit]. I moved it. Shit was getting hot [suspected law enforcement presence in the area]. I moved it to Indiana. But I grabbed everything with me." ZAYED then stated, "we gotta probably link up tomorrow." CS-2 then asked for the address of where they should meet the next day. ZAYED responded, "I can meet you at that location, Steger [**Subject Premises**], tomorrow?" ZAYED then said, "I can show you everything over there, it's fine." ZAYED informed CS-2 that he would be at the **Subject Premises** starting at 9 a.m. the next morning. At approximately 12:30 a.m., ZAYED, using **Subject Phone 2**, texted CS-2 the address for the **Subject Premises**.

87.     At approximately 11:20 a.m., CS-2 met with law enforcement at a predetermined location wherein CS-2 was equipped with an audio/video recording device. CS-2 was searched for firearms, contraband, and U.S. currency and none was found. At approximately 11:22 a.m., CS-2 and ZAYED, who was **Subject Phone 2**, spoke on the phone in a consensually recorded conversation.  CS-2 informed ZAYED that he was "heading your way [to the **Subject Premises**], be there about 30 minutes."  ZAYED responded, "I'll be there [at the **Subject Premises**] in about 35 minutes."

88.     At approximately 11:28 a.m., CS-2 departed the predetermined location and, while under constant surveillance, traveled to the area of the **Subject Premises** where CS-2 and ZAYED agreed to meet.  Investigators observed CS-2 arrive at the **Subject Premises** at approximately 12:33 p.m.

89.     At approximately 12:37 p.m., CS-2 exited his car and approached the **Subject Premises**.  As CS-2 walked toward the **Subject Premises**, he was approached by an unidentified male ("UM-1") who appeared to have walked out of the entrance of the **Subject Premises**.  According to the audio/video recording device, CS-2 informed UM-1 that he (CS-2) was "waiting on Archie to pull up, bad boy Archie [ZAYED]."  CS-2 then asked, "he on his way," to which UM-1 responded "Yeah, he's coming."  According to the audio/video recording device, UM-1 asked CS-2 where CS-2 parked his car and then said, "You can move it on the side, cuz that's [area where CS-2 parked] the mechanic shop.

90.     At approximately 12:42 p.m., ZAYED was observed arriving at the **Subject Premises** and entering the front passenger seat of the vehicle driven by CS-2.  According to CS-2's audio/video recording device, CS-2 stated "I need a big deal [for firearms].  I got a big play I need ready."  ZAYED responded, "so I got five ready . . . no, no builds [ghost guns]."  A moment later, ZAYED clarified that he had "one hand[gun] build" and "one AR [rifle] build ready, coming."

91.     ZAYED then instructed CS-2 to bring his car to a different parking spot at the **Subject Premises** and to "park by that white truck [the Subject Vehicle] right there."  ZAYED and CS-2 then exited CS-2's vehicle and walked toward a white Buick LeSabre, with Illinois license plates ending in -0850.[19]  According to the audio/video recording device, ZAYED opened the trunk of the LeSabre, and showed CS-2  several handguns in a bag.

 

---

[19] According to the Illinois Secretary of State's Office, the Buick LeSabre is a 2004 model, registered to ARSHAD ZAYED at the Matteson Auto Spa address.

55

92. According to the audio/video recording device, CS-2 asked ZAYED, "so you working out the trunk. Okay." ZAYED responded, "I'm working out here [**Subject Premises**], I just went and grabbed them [the firearms]." ZAYED went on to state that he was pulled over by police in Indiana the night before. ZAYED stated, "I had to move all my shit [firearms] here [to the **Subject Premises** from Indiana]. Started getting hot [suspected law enforcement presence in the area]."

93. According to the audio/video recording device, CS-2 agreed to purchase approximately $20,000 worth of firearms from ZAYED at a later date.

94. At approximately 12:51 p.m., while under constant surveillance, CS-2 departed the **Subject Premises** and subsequently arrived at a predetermined meet location with law enforcement at approximately 2:18 p.m.

**I.    ARSHAD ZAYED is Not a Licensed Dealer.**

95. A Federal Firearms License is a license in the United States that enables an individual or a company to engage in a business pertaining to the manufacture or importation of firearms and ammunition, or the interstate and intrastate sale of firearms.

96. On or about June 2, 2022, an ATF Federal Firearms Licensing supervisor, certified that, at the time of the above-described firearms transactions, ZAYED did not possess a Federal Firearms License.

## II.     FACTS SUPPORTING PROBABLE CAUSE TO BELIEVE EVIDENCE, INSTRUMENTALITIES, AND FRUITS WILL BE FOUND IN THE SUBJECT PHONES

97.     Based on my training and experience, the training and experience of other law-enforcement members with whom I have consulted, and my experience in this investigation, I believe ZAYED utilizes **Subject Phone 1** and **Subject Phone 2** (collectively, the "**Subject Phones**") to communicate with individuals regarding the sale of firearms. I believe that the **Subject Phones** will contain evidence of suppliers of firearms that supply ZAYED with firearms, while also assisting law enforcement in identifying any currently unknown co-conspirators.

98.     In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use,

57

and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

99.     Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

100.     Based on my training and experience, and the training and experience of other law enforcement officers, I know that individuals involved in criminal offenses often store telephone numbers and names or nicknames of fellow conspirators on their telephones and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones.

101.     As such, I believe the **Subject Phones** will contain the evidence and

58

instrumentalities of ZAYED's unlawful distribution of firearms.

102.   Moreover, based on my training and experience, gun manufacturers generally use electronic devices connected to the Internet to purchase firearm components.  For example, during the transaction between ZAYED and CS-2 on or about January 11, 2022, investigators believe that ZAYED obtained the Glock upper/slide bearing serial number BVXY326 (from Firearm #8) he sold to CS-2 via an online order placed to a firearm and firearm accessories store in Evansville, Indiana. In addition, based on my training and experience, I know that firearm-component suppliers often request a user's contact information, including email address, through which the supplier may contact the user with information regarding the purchase and delivery. Furthermore, based on my training and experience, and the training and experience with other law enforcement members with whom I have consulted, I know that users, such as ZAYED, seeking to purchase firearm components online often use their devices to perform Internet searches regarding various parts, suppliers, user reviews, and/or information regarding assembly, maintenance, and functionality. While such activity may be conducted through a smart cellular telephone, such as the **Subject Phones**, based on my training and experience, gun manufacturers often use other devices, such as laptops, smart pads, or desktop computers to perform the same activity. As a result, I believe that if devices appearing to belong to ARSHAD ZAYED, apart from the **Subject Phones**, are found in the **Subject Premises**, such devices will likely contain evidence, or constitute

instrumentalities, of the Subject Offenses.[20]

## III. SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

103. Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.

---

[20] Such devices, without limitation, may appear to be used by ARSHAD ZAYED based on their location (*e.g.*, in room appearing to belong to him), appearance (*e.g.*, marked with his name), and/or statements made by others at the premises regarding by whom a particular device is used

The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

104.    In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

105.    In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## IV.    PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

106.    Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of

electronically stored information described in Attachments A-2 and A-3 so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

107.  The review of electronically stored information and electronic storage media described in Attachments A-2 and A-3 may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.  examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachments B-2 and B-3;

b.  searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachments B-2 and B-3 (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.  surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachments B-2 and B-3;

      d.    opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachments B-2 and B-3.

## V. BIOMETRIC ACCESS TO DEVICES

108.    This warrant permits law enforcement agents to obtain from the person of ZAYED the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the **Subject Phones**.  The grounds for this request are as follows:

      a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices such as the **Subject Phones** offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

109.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of

the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

110. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Apple devices and is called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Android's "Trusted Face") have different names but operate similarly to Face ID.

111. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. During the registration for these features, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises.

112. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric

64

passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

113. The passcode or password that would unlock the **Subject Phones** subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the **Subject Phones**, making the use of biometric features necessary to the execution of the search authorized by this warrant.

114. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

115.    Due to the foregoing, if the **Subject Phones** may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from ZAYED the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the **Subject Phones**, including to (1) press or swipe the fingers (including thumbs) of ZAYED to the fingerprint scanner of the **Subject Phones**; (2) hold the **Subject Phones** in front of the face of ZAYED to activate the facial recognition feature; and/or (3) hold the **Subject Phones** in front of the face of ZAYED to activate the iris recognition feature, for the purpose of attempting to unlock the **Subject Phones** in order to search the contents as authorized by this warrant.

116.    The proposed warrant does not authorize law enforcement to require that ZAYED state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the **Subject Phones**. Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel ZAYED to state or otherwise provide that information.   However, the voluntary disclosure of such information by ZAYED would be permitted under the proposed warrant. To avoid confusion on that point, if agents in executing the warrant ask ZAYED for the password to the **Subject Phones**, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks the **Subject**

66

**Phones**, the agents will not state or otherwise imply that the warrant requires ZAYED to state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the **Subject Phones**, and will make clear that providing any such information is voluntary and that ZAYED is free to refuse the request.

## VI. CONCLUSION

117. Based on the foregoing, I submit that there is probable cause to believe that on or about August 24, 2021, October 26, 2021, January 5, 2022, January 11, 2022, February 3, 2022, March 25, 2022, and June 15, 2022, in Matteson, Northern District of Illinois, Eastern Division, and elsewhere, the defendant, ARASHAD ZAYED, did willfully engage in the business of manufacturing and dealing in firearms without being a licensed firearms dealer, violation of Title 18, United States Code, Section 922(a)(1)(A) and did unlawfully possess and transfer a machine gun, in violation of Title 18, United States Code, Section 922(o), and that evidence, instrumentalities, and fruits relating to this criminal conduct will be found in the the **Subject Premises**, more particularly described in A-1; **Subject Phone 1**, more particularly described in Attachment A-2,; and **Subject Phone 2**, more particularly described in Attachment A-3, authorizing the seizure of the items described in Attachments B, pursuant to the protocol described in the addendums to Attachments B.

FURTHER AFFIANT SAYETH NOT.

s/ Shamar Bailey (with permission BWJ)

SHAMAR BAILEY
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN to
telephonically on July 26, 2022.

BETH W. JANTZ
United States Magistrate Judge

68